| STATE OF SOUTH DAKOTA | ) | IN CIRCUIT COURT |
|---|---|---|
| | :SS | |
| COUNTY OF BROOKINGS | ) | THIRD JUDICIAL CIRCUIT |

| | |
|---|---|
| ZANWAT EQUIPMENT, LLC, <br><br> Plaintiff, <br> v. <br><br> BOSS FEEDS, LTD, <br><br> Defendant. | 05CIV22- <br><br> **COMPLAINT AND JURY DEMAND** |

COMES NOW, Plaintiff, Zanwat Equipment, LLC (hereafter "Zanwat" or "Plaintiff"), by and through its undersigned counsel, and for its Complaint against the above-named Defendant, Boss Feeds, LTD (hereafter "Defendant" or "Boss Feeds"), states and alleges as follows:

## PARTIES

1.    Zanwat is a limited liability company organized under the laws of South Dakota, with its principal place of business located in Aurora, Brookings County, South Dakota.

2.    Boss Feeds is a Canadian company with its principal place of business located in Cardston, Alberta, Canada.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to SDCL 16-6-9.

4.    Further, the parties to this action have expressly stipulated to allow this Court to exercise jurisdiction over this dispute pursuant to the express terms of the agreement between the parties.

5.    Venue is proper in Brookings County, South Dakota, pursuant to SDCL 15-5-5, 15-5-6, and 15-5-8.

1

**EXHIBIT B**

6.    Further, the parties to this action have expressly stipulated to Brookings County, South Dakota, as the proper venue for this dispute pursuant to the express terms of the agreement between the parties.

## FACTUAL ALLEGATIONS

7.    On or about June 16, 2020, Zanwat and Boss Feeds entered into an Equipment Lease Agreement ("Equipment Agreement"). A true and correct copy of the Equipment Agreement is attached hereto as **Exhibit 1**.

8.    The terms of the Equipment Agreement remain through June 16, 2030.

9.    Pursuant to the Equipment Agreement, Zanwat agreed to lease equipment to Boss Feeds for the production of livestock lick tubs at Boss Feeds' facility in Canada.

10.    Zanwat fully performed its obligations owing to Boss Feeds under the Equipment Agreement. Specifically, among other things, Zanwat leased equipment to Boss Feeds, delivered the equipment to Boss Feeds' manufacturing facility in Canada, configured the equipment using Zanwat's confidential and proprietary methods, and demonstrated the proper operation of the equipment for its intended use.

11.    In consideration of Zanwat's performance under the Equipment Agreement, Boss Feeds agreed to make payments to Zanwat consistent with Exhibit B to the Equipment Agreement. Specifically, Boss Feeds agreed, among other things, to make quarterly payments based on the net cash from the operations of Boss Feeds' manufacturing operation.

12.    Boss Feeds has failed to fulfill its obligations owing to Zanwat under the Equipment Agreement, including, but expressly not limited to, failing to make required financial disclosures; failing to keep confidential, proprietary information of Zanwat that Zanwat provided to Boss Feeds

2

in conjunction with the Equipment Agreement; and failing to make quarterly lease payment as required under the Equipment Agreement.

13.     In consideration of Zanwat's performance under the Equipment Agreement, Boss Feeds agreed not to disclose certain confidential information owned by Zanwat consistent with Exhibit C to the Equipment Agreement ("Non-Disclosure Agreement"). Specifically, Boss Feeds, via certain designated recipients of the confidential information, agreed to receive the confidential information and agreed, among other things, that the confidential information would only be used by the designated recipients while they were employed by, or in contract with, Boss Feeds, to use its best efforts to maintain the confidentiality of the confidential information, not to reverse engineer nor attempt to obtain additional information beyond the scope of the Non-Disclosure Agreement, and not to independently develop concepts, ideas, or designs related to any features or characteristics of the confidential information. True and correct copies of the signed Non-Disclosure Agreements (Exhibit C to the Equipment Agreement) are attached hereto as **Exhibits 2A and 2B**.

14.     Boss Feeds has failed to fulfill its obligations owing to Zanwat under the Non-Disclosure Agreement, including, but expressly not limited to, failing to have its designated recipients only use the confidential information while employed by, or in contract with, Boss Feeds, failing to use its best efforts to maintain the confidentiality of the confidential information, failing to not reverse engineer nor attempt to obtain additional information beyond the scope of the Non-Disclosure Agreement, and failing to not to independently develop concepts, ideas, or designs related to any features or characteristics of the confidential information.

15.     In a letter dated April 22, 2022, Zanwat, through counsel, gave notice to Boss Feeds of Boss Feeds' default under the Equipment Agreement and demanded that Boss Feeds: (1) pay

all sums due and owing under the Equipment Agreement; and (2) provide the financial reporting required by the Equipment Agreement ("April 22, 2022 Letter"). A true and correct copy of the April 22, 2022 Letter is attached hereto as **Exhibit 3**.

16.     In the April 22, 2022 Letter, Zanwat also gave Boss Feeds notice of Zanwat's intent to exercise its right under Exhibit B to the Equipment Agreement to examine and audit certain books and records of Boss Feeds.

17.     Zanwat has performed all conditions precedent to the initiation of this action, or Boss Feed's actions indicate those steps are futile and need not be performed.

## COUNT I: BREACH OF CONTRACT
### (Equipment Agreement)

18.     Zanwat realleges the foregoing paragraphs and hereby incorporates them in full as though fully stated herein.

19.     Zanwat and Boss Feeds entered into a valid contract, the Equipment Agreement, for Zanwat to lease equipment to Boss Feeds for the production of lick tubs at Boss Feeds' facility in Canada.

20.     Zanwat fully performed its obligations owing under the Equipment Agreement by, among other things, delivering the equipment to Boss Feeds' manufacturing facility in Canada, configuring the equipment using Zanwat's confidential and proprietary methods, and demonstrating the proper operation of the equipment for its intended use.

21.     Boss Feeds breached its duty of performance toward Zanwat under the Equipment Agreement by, among other things, failing to make required financial disclosures; failing to keep confidential, proprietary information of Zanwat that Zanwat provided to Boss Feeds in conjunction with the Equipment Agreement; and failing to make quarterly lease payment as required under the Equipment Agreement.

4

22.     Boss Feeds also breached its duty of good faith and fair dealing toward Zanwat.

23.     As a result of Boss Feeds' breach of the Equipment Agreement, Zanwat has suffered, and continues to suffer, monetary damages to be specified at trial.

## COUNT II: BREACH OF CONTRACT
### (Non-Disclosure Agreement)

24.     Zanwat realleges the foregoing paragraphs and hereby incorporates them in full as though fully stated herein.

25.     Zanwat and Boss Feeds entered into a valid contract, the Non-Disclosure Agreement, for Zanwat to provide Boss Feeds with certain confidential information related to the production of lick tubs and Boss Feeds agreed to keep this information confidential.

26.     Zanwat fully performed its obligations owing under the Non-Disclosure Agreement by, among other things, providing Boss Feeds with the confidential information.

27.     Boss Feeds breached its duty of performance toward Zanwat under the Non-Disclosure Agreement by, among other things, failing to have its designated recipients only use the confidential information while employed by, or in contract with, Boss Feeds, failing to use its best efforts to maintain the confidentiality of the confidential information, failing to not reverse engineer nor attempt to obtain additional information beyond the scope of the Non-Disclosure Agreement, and failing to not to independently develop concepts, ideas, or designs related to any features or characteristics of the confidential information.

28.     Boss Feeds also breached its duty of good faith and fair dealing toward Zanwat.

29.     As a result of Boss Feeds' breach of the Non-Disclosure Agreement, Zanwat has suffered, and continues to suffer, monetary damages to be specified at trial.

## COUNT III: UNJUST ENRICHMENT

30.    Zanwat realleges the foregoing paragraphs and hereby incorporates them in full as though fully stated herein.

31.    Boss Feeds received a benefit in the form of, among other things, delivering the equipment to Boss Feeds' manufacturing facility in Canada, configuring the equipment using Zanwat's confidential and proprietary methods, and demonstrating the proper operation of the equipment for its intended use.

32.    Boss Feeds was cognizant of the benefit received in the form of, among other things, delivering the equipment to Boss Feeds' manufacturing facility in Canada, configuring the equipment using Zanwat's confidential and proprietary methods; and demonstrating the proper operation of the equipment for its intended use.

33.    Boss Feeds' retention of the benefit in the form of, among other things, delivering the equipment to Boss Feeds' manufacturing facility in Canada, configuring the equipment using Zanwat's confidential and proprietary methods; and demonstrating the proper operation of the equipment for its intended use unjustly enriches Boss Feeds and should be disgorged.

34.    Boss Feeds also received a benefit in the confidential information Zanwat provided Boss Feeds related to the production of lick tubs.

35.    Boss Feeds was cognizant of the benefit it received in the form of the confidential information Zanwat provided Boss Feeds related to the production of lick tubs.

36.    Boss Feeds retention of the benefit in the form of the confidential information Zanwat provided Boss Feeds related to the production of lick tubs unjustly enriches Boss Feeds and should be disgorged.

37.    Boss Feeds should be required to compensate Zanwat for the value of the benefits conferred.

## COUNT IV: QUANTUM MERUIT

38.     Zanwat realleges the foregoing paragraphs and hereby incorporates them in full as though fully stated herein.

39.     Zanwat provided Boss Feeds a benefit as a result of the equipment and work performed by Zanwat for Boss Feeds' manufacturing facility in Canada.

40.     Boss Feeds received and retained the benefit of the equipment furnished and work performed by Zanwat for Boss Feeds' manufacturing facility in Canada.

41.     Boss Feeds was cognizant of the benefit it received in the form of the equipment furnished and work performed by Zanwat for Boss Feeds' manufacturing facility in Canada.

42.     Boss Feeds requested Zanwat's services in the form of the equipment furnished and work performed by Zanwat for Boss Feeds' manufacturing facility in Canada, and Zanwat reasonably expected to be paid for said services.

43.     Boss Feeds has not fully compensated Zanwat for the value of the services Zanwat provided in the form of the equipment furnished and work performed by Zanwat for Boss Feeds' manufacturing facility in Canada.

44.     It would be inequitable to allow Boss Feeds to retain the value of the services provided in the form of the equipment furnished and work performed by Zanwat for Boss Feeds' manufacturing facility in Canada without full compensation to Zanwat.

45.     Boss Feeds should be required to compensate Zanwat for the value of the services performed by Zanwat in the form of the equipment furnished and work performed by Zanwat for Boss Feeds' manufacturing facility in Canada.

## COUNT V:  PROMISSORY ESTOPPEL

46.    Zanwat realleges the foregoing paragraphs and hereby incorporates them in full as though fully stated herein.

47.    Boss Feeds promised Zanwat that it would fully compensate Zanwat for delivering the equipment to Boss Feeds' manufacturing facility in Canada, configuring the equipment using Zanwat's confidential and proprietary methods, and demonstrating the proper operation of the equipment for its intended use.

48.    Boss Feeds also promised Zanwat that it would make financial disclosures and keep confidential, proprietary information of Zanwat that Zanwat provided to Boss Feeds in conjunction with the Equipment Agreement.

49.    Boss Feeds promised that it would keep certain information that Zanwat provided related to the production of lick tubs confidential.

50.    Boss Feeds also promised, pursuant to the Non-Disclosure Agreement, that it would only have its designated recipients use the confidential information while employed by, or in contract with, Boss Feeds, that it would use its best efforts to maintain the confidentiality of the confidential information, that it would not reverse engineer nor attempt to obtain additional information beyond the scope of the Non-Disclosure Agreement, and that it would not to independently develop concepts, ideas, or designs related to any features or characteristics of the confidential information.

51.    Zanwat reasonably and justifiable relied on Boss Feeds' promise that it would fully compensate Zanwat for delivering the equipment to Boss Feeds' manufacturing facility in Canada, configuring the equipment using Zanwat's confidential and proprietary methods, and demonstrating the proper operation of the equipment for its intended use.

8

52.     Zanwat also reasonably and justifiably relied on Boss Feeds' promises that it would make financial disclosures and keep confidential, proprietary information of Zanwat that Zanwat provided to Boss Feeds in conjunction with the Equipment Agreement.

53.     Zanwat reasonably and justifiably relied on Boss Feeds' promise that it would keep certain information that Zanwat provided related to the production of lick tubs confidential.

54.     Zanwat also reasonably and justifiably relied on Boss Feeds' promise promised, pursuant to the Non-Disclosure Agreement, that it would only have its designated recipients use the confidential information while employed by, or in contract with, Boss Feeds, that it would use its best efforts to maintain the confidentiality of the confidential information, that it would not reverse engineer nor attempt to obtain additional information beyond the scope of the Non-Disclosure Agreement, and that it would not to independently develop concepts, ideas, or designs related to any features or characteristics of the confidential information.

55.     Zanwat altered its position to its detriment in the reasonable belief that Boss Feeds would perform its promise and fully compensate Zanwat for delivering the equipment to Boss Feeds' manufacturing facility in Canada, configuring the equipment using Zanwat's confidential and proprietary methods; and demonstrating the proper operation of the equipment for its intended use.

56.     Zanwat also altered its position to its detriment in the reasonable belief that Boss Feeds would perform its promises and make financial disclosures and keep confidential, proprietary information of Zanwat that Zanwat provided to Boss Feeds in conjunction with the Equipment Agreement.

57.     Zanwat altered its position to its detriment in the reasonable belief that Boss Feeds would perform its promises and keep certain information that Zanwat provided related to the production of lick tubs confidential.

58.     Zanwat also altered its position to its detriment in the reasonable belief that Boss Feeds would perform its promises, pursuant to the Non-Disclosure Agreement, and only have its designated recipients use the confidential information while employed by, or in contract with, Boss Feeds, that it would use its best efforts to maintain the confidentiality of the confidential information, that it would not reverse engineer nor attempt to obtain additional information beyond the scope of the Non-Disclosure Agreement, and that it would not to independently develop concepts, ideas, or designs related to any features characteristics of the confidential information.

59.     The detriment suffered by Zanwat in reliance on Boss Feeds' promises is economically substantial.

60.     The detriment suffered by Zanwat was foreseeable by Boss Feeds.

## COUNT VI: FRAUD AND DECEIT

61.     Zanwat realleges the foregoing paragraphs and hereby incorporates them in full as though fully stated herein.

62.     Boss Feeds represented to Zanwat as a statement of fact that it would fully compensate Zanwat for delivering the equipment to Boss Feeds' manufacturing facility in Canada, configuring the equipment using Zanwat's confidential and proprietary methods; and demonstrating the proper operation of the equipment for its intended use.

63.     Boss Feeds also represented to Zanwat as a statement of fact that it would make financial disclosures and keep confidential, proprietary information of Zanwat that Zanwat provided to Boss Feeds in conjunction with the Equipment Agreement.

10

64. Boss Feeds represented to Zanwat as a statement of fact that it would keep certain information that Zanwat provided related to the production of lick tubs confidential.

65. Boss Feeds also represented to Zanwat as a statement of fact that it would only have its designated recipients use the confidential information while employed by, or in contract with, Boss Feeds, that it would use its best efforts to maintain the confidentiality of the confidential information, that it would not reverse engineer nor attempt to obtain additional information beyond the scope of the Non-Disclosure Agreement, and that it would not to independently develop concepts, ideas, or designs related to any features or characteristics of the confidential information.

66. These representations made by Boss Feeds to Zanwat were untrue and intentionally and recklessly made.

67. These representations by Boss Feeds to Zanwat were made with the intent to deceive Zanwat for the purpose of inducing Zanwat to act upon these representations.

68. In reasonable and justifiable reliance on these representations made by Boss Feeds to Zanwat, Zanwat delivered the equipment to Boss Feeds' manufacturing facility in Canada, configured the equipment using Zanwat's confidential and proprietary methods, and demonstrated the proper operation of the equipment for its intended use.

69. In reasonable and justifiable reliance on these representations made by Boss Feeds to Zanwat, Zanwat provided Boss Feeds with confidential information related to the production of lick tubs.

70. Zanwat's reliance on these representations by Boss Feeds to Zanwat resulted in injury and damage to Zanwat.

71.    Boss Feeds' fraudulent and deceitful conduct was oppressive, malicious, intentional, willful, and wanton, entitling Zanwat to receive punitive damages in an amount to be determined at trial.

### COUNT VII: CONVERSION

72.    Zanwat realleges the foregoing paragraphs and hereby incorporates them in full as though fully stated herein.

73.    Zanwat owned, continues to own, and has a possessory interest in the equipment it delivered to Boss Feeds' manufacturing facility in Canada.

74.    Zanwat's interest in the equipment it delivered to Boss Feeds' manufacturing facility in Canada is greater than Boss Feeds' interest in this equipment.

75.    Boss Feeds has exercised dominion and control over and seriously interfered with Zanwat's interest in the equipment it delivered to Boss Feeds' manufacturing facility in Canada.

76.    This conduct by Boss Feeds has deprived Zanwat of its interest in the equipment it delivered to Boss Feeds' manufacturing facility in Canada.

77.    Boss Feeds' unauthorized exercise of control and dominion over the equipment Zanwat delivered to Boss Feeds' manufacturing facility in Canada repudiates Zanwat's right in the equipment and is inconsistent with such right.

78.    Boss Feeds' conduct in converting the equipment Zanwat delivered to Boss Feeds' manufacturing facility in Canada was oppressive, malicious, intentional, willful, and wanton, entitling Zanwat to receive punitive damages in an amount to be determined at trial.

### COUNT VIII: ACCOUNTING AND AUDIT

79.    Zanwat realleges the foregoing paragraphs and hereby incorporates them in full as though fully stated herein.

80.    Under Exhibit B to the Equipment Agreement, Boss Feeds was required to provide to Zanwat, within 30 days following the end of each calendar quarter during the term of the Equipment Agreement, a complete and accurate lease payment report calculating net cash from operations during the most recently ended calendar quarter.

81.    Boss Feeds has failed to make these financial disclosures as required under Exhibit B to the Equipment Agreement.

82.    Under Exhibit B to the Equipment Agreement, Boss Feeds was required to create and maintain complete and accurate books and records that are sufficient to determine the amounts payable to Zanwat under the Equipment Agreement in a form complying with GAAP ("Books and Records") and IFRS Standards as generally accepted accounting standards in Canada; and ensure that sufficient electronic or other appropriate backup systems.

83.    Under Exhibit B to the Equipment Agreement, upon no less than 30 days prior written notice, Zanwat has the right to examine and audit, through a recognized registered public accounting firm designated by Zanwat (the "Auditor"), all Books and Records of Boss Feeds.

84.    In the April 22, 2022 Letter, Zanwat gave Boss Feeds notice of Zanwat's intent to exercise its right under Exhibit B to the Equipment Agreement to examine and audit all Books and Records of Boss Feeds.

85.    Under Exhibit B to the Equipment Agreement, Boss Feeds was required to make all Books and Records available to the Auditor to examine at the normal location where Boss Feeds maintains the Books and Records and provide copies thereof to be retained by the Auditor in the Books and Records in electronic native format to be retained by the Auditor in its records.

86.    Boss Feeds has failed: (1) to make any Books and Records available to the Auditor to examine at the normal location where Boss Feeds maintains the Books and Records as required

13

under Exhibit B to the Equipment Agreement; and (2) to provide copies thereof to be retained by the Auditor in the Books and Records in electronic native format to be retained by the Auditor in its records as required under Exhibit B to the Equipment Agreement.

## COUNT IX: MISAPPROPRIATION OF
## TRADE SECRET PURSUANT TO SDCL 37-29, *et seq.*

87.     Zanwat realleges the foregoing paragraphs and hereby incorporates them in full as though fully stated herein.

88.     Zanwat's confidential information obtained by Boss Feeds, including, but expressly not limited to, plant and manufacturing equipment configurations, know-how, and plant manufacturing plant designs for the production of lick tubs, includes trade secrets and/or other proprietary information that derives independent economic value from not being known to, and not being readily available through proper means by, another person who can obtain economic value from the disclosure or use of the information.

89.     Zanwat's confidential and trade secret information has been and continues to be the subject of Zanwat's reasonable measures to keep such information secret.

90.     Boss Feeds misappropriated such confidential information and trade secret information of Zanwat in connection with its production of lick tubs in Canada.

91.     As a result of Boss Feeds' misappropriation, Zanwat has been, and continues to be, damaged in an amount to be determined at trial.

92.     Boss Feeds' misappropriation is willful and malicious thereby entitling Zanwat to an award of exemplary damages and attorneys' fees pursuant to SDCL 37-29-3 and 37-29-4.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court for judgment as follows:

14

1.     Plaintiff be awarded a judgment against Boss Feeds for compensatory damages, exemplary damages, and punitive damages in an amount to be determined at trial;

2.     Boss Feeds be required to provide to Zanwat a complete and accurate lease payment report calculating net cash from operations for each ended calendar quarter as required by Exhibit B to the Equipment Agreement;

3.     Boss Feeds be required to make all Books and Records available to the Auditor to examine at the normal location where Boss Feeds maintains the Books and Records, and provide copies thereof to be retained by the Auditor in the Books and Records in electronic native format to be retained by the Auditor in its records as required by Exhibit B to the Equipment Agreement;

4.     Plaintiff be awarded prejudgment and post-judgment interest as allowed by law and the Equipment Agreement on all items of damages awarded by the jury at the maximum rate of interest;

5.     Plaintiff be awarded its costs, disbursements. and attorneys' fees incurred in this proceeding;

6.     Boss Feeds be required to specifically perform its obligations under the Equipment Agreement, or. in the alternative;

7.     Plaintiff be awarded permanent injunctive relief as determined by the Court; and

8.     Plaintiff be awarded such other relief as this Court deems just and equitable.

Dated this 1st day of November 2022.

　　　　　　　　　　　　　　　　　/s/ Paul W. Tschetter
　　　　　　　　　　　　　　　　　Paul W. Tschetter
　　　　　　　　　　　　　　　　　David J. Hieb
　　　　　　　　　　　　　　　　　BOYCE LAW FIRM, L.L.P.
　　　　　　　　　　　　　　　　　300 S. Main Avenue
　　　　　　　　　　　　　　　　　P.O. Box 5015
　　　　　　　　　　　　　　　　　Sioux Falls, SD 57117-5015
　　　　　　　　　　　　　　　　　(605) 336-2424
　　　　　　　　　　　　　　　　　pwtschetter@boycelaw.com
　　　　　　　　　　　　　　　　　djhieb@boycelaw.com
　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims, issues, and defenses so triable.

## NOTICE OF APPEARANCE

Notice is given that the undersigned attorneys appear as attorneys of record for Plaintiff, Zanwat Equipment, LLC, in this action.

Dated this 1st day of November 2022.

　　　　　　　　　　　　　　　　　/s/ Paul W. Tschetter
　　　　　　　　　　　　　　　　　Paul W. Tschetter
　　　　　　　　　　　　　　　　　David J. Hieb
　　　　　　　　　　　　　　　　　BOYCE LAW FIRM, L.L.P.
　　　　　　　　　　　　　　　　　300 S. Main Avenue
　　　　　　　　　　　　　　　　　P.O. Box 5015
　　　　　　　　　　　　　　　　　Sioux Falls, SD 57117-5015
　　　　　　　　　　　　　　　　　(605) 336-2424
　　　　　　　　　　　　　　　　　pwtschetter@boycelaw.com
　　　　　　　　　　　　　　　　　djhieb@boycelaw.com
　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*

**EXHIBIT**

_1_

## EQUIPMENT LEASE AGREEMENT

This **EQUIPMENT LEASE AGREEMENT** (this "Agreement") is entered into effective as of the _11_ day of _June_ , 2020 (the "Effective Date") by and between **ZANWAT EQUIPMENT, LLC**, a South Dakota Limited Liability Company, of PO Box 336, Aurora, SD 57002, (the "Lessor") and **BOSS FEEDS, LTD**, of PO Box 107, Cardston Alberta Canada TOK OKO (the "Lessee"). The Lessor and Lessee may each be individually referred to herein as a "Party" and collectively as the "Parties."

**WHEREAS**, the Lessor is the owner of certain Equipment described in Section 1 of this Agreement; and

**WHEREAS**, Lessee desires to lease the Equipment from the Lessor and the Lessor agrees to lease the Equipment to Lessee under the terms and conditions set forth in this Agreement.

**NOW THEREFORE**, in consideration of the foregoing and the mutual covenants contained in this Agreement, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      **Equipment**. The Lessor hereby leases to Lessee and Lessee hereby leases from the Lessor that certain equipment (the "Equipment"), as fully described in Exhibit A, attached hereto, and incorporated herein by reference.

2.      **Term**. This Agreement shall be for a term of ten (10) years, which shall commence on the date the equipment begins operating and shall remain in full force and effect, for a period of five years from the date of this Agreement (the "Initial Term"). Upon the expiration of the Initial Term, the Agreement shall be automatically renewed for successive periods of five (5) years each (each, a "Renewal Term"), unless either Party gives written notice of termination to the other Party at least 30 days prior to (but in no case more than 60 days prior to) the expiration of the Initial Term or of any Renewal Term.

3.      **Lease Payment**. As rent for the Equipment, Lessee shall pay to the Lessor, the rental payments per the payment schedule (the "Payment Schedule") set forth in Exhibit B, attached hereto and incorporated herein by reference. The first rental payment shall become due and payable quarterly as defined in Exhibit B and within 30 days of the end of the first quarter of operation of the equipment.

4.      **Security Deposit**. NONE

5.      **Taxes**. Lessee shall pay all sales, use, excise, personal property or other taxes (excepting state and federal income taxes and other taxes upon the payments for the Lessor) that

**EXHIBIT 1**

may be imposed on either Party as a result of this transaction. Lessee shall indemnify, defend and hold the Lessor, its employees and agents harmless from all liabilities, suits, judgments, obligations, fines, penalties, claims, costs, and expenses (including reasonable attorneys' fees) arising out of the imposition of, or attempt to impose, any such tax on the Lessor. The Lessee shall be responsible for the payment of GST/PST with respect to the equipment. The Lessor will collect from the Lessee such GST/PST and remit the GST/PST to the appropriate governmental agency in Canada.

6.    **Maintenance.** Throughout the Term, Lessee shall provide for the service, repair and maintenance of the Equipment, at Lessee's expense, so as to keep the Equipment in as good condition, repair, appearance and working order as when delivered to Lessee hereunder, ordinary wear and tear excepted. Lessee shall, at Lessee's expense, replace any and all parts and devices which may from time to time become worn out, lost, stolen, destroyed, damaged beyond repair, or rendered unfit for use for any reason whatsoever. All such replacement parts, mechanisms, and devices shall be free and clear of liens, encumbrances, and rights of others and shall become the property of the Lessor and shall be covered by this Agreement to the same extent as the Equipment originally covered by this Agreement.

7.    **Use of Equipment.** Lessee shall exercise due care in its operation, use and maintenance of the Equipment. Lessee shall not use, and shall not permit others to use, the Equipment in any manner that would contravene applicable laws, rules, regulations and other governmental directives, would violate the terms of any manufacturer's or like warranty, or would contravene the manufacturer's reasonable operational standards for the Equipment. Lessee shall not alter or modify the Equipment without the prior written consent of the Lessor.

8.    **Permits.** Lessee shall obtain all permits and licenses necessary for the installation, operation, possession and use of the Equipment. Lessee shall comply with all laws, rules, regulations and other governmental directives applicable to the installation, use, and operation of the Equipment and, if compliance with such law, rule, regulation or other governmental directive requires changes or additions to be made to the Equipment, such changes or additions shall be made by Lessee at Lessee's cost and expense upon the Lessor's written approval of the same.

9.    **Utility Charges.** Lessee shall pay all charges for gas, water, steam, electricity, light, heat, power, telephone, or other utility service to be used on or in connection with the Equipment, including charges for installation of such services.

10.    **Default; Remedies.** If (a) Lessee shall default in the payment of any rent or in making any other payment hereunder when due, or (b) Lessee shall default in the payment when due of any indebtedness of Lessee to the Lessor arising independently of this Agreement, or

**EXHIBIT 1**

Lessee shall default in the performance of any other covenant herein and such default shall continue for five (5) days after written notice to Lessee by the Lessor, or (d) Lessee becomes insolvent or makes an assignment for the benefit of creditors, or (e) Lessee applies for or consents to the appointment of a receiver, trustee, or liquidator of Lessee or of all or a substantial part of the assets of Lessee under the Bankruptcy Act in the United States or Canada, or any amendment thereto or under any other insolvency law or law providing for the relief of debtors, then, if and to the extent permitted by law, the Lessor shall have the right to exercise any one or more of the following remedies:

(i)    To declare the entire amount of rent hereunder immediately due and payable as to any or all items of the Equipment, without notice or demand to Lessee;

(ii)   To sue for and recover all rents, and other payments, then accrued or thereafter accruing, with respect to any or all items of the Equipment;

(iii)  To take possession of any or all items of the Equipment without demand, notice, or legal process, wherever they may be located. Lessee hereby waives any and all damages occasioned by such taking of possession. Any said taking of possession shall not constitute a termination of this Agreement as to any or all items of Equipment unless the Lessor expressly so notifies Lessee in writing;

(iv)   To terminate this Agreement as to any or all items of Equipment; and

(v)    To pursue any other remedy at law or in equity.

All such remedies are cumulative and may be exercised concurrently or separately.

11.    Return of Equipment. Upon termination of this Agreement, Lessee, at is sole cost and expense, shall promptly deliver the Equipment to the Lessor at the Lessor's address set forth below. Lessee shall be responsible for any damage to the Equipment in shipping the Equipment back to the Lessor. In the event the Lessor provides shipping instructions to Lessee, Lessee shall comply with such shipping instructions.

12.    Insurance. Lessee hereby acknowledges and agrees that its assumption of loss of the Equipment shall attach upon the earlier of (i) Lessee's receipt of the Equipment, or (ii) upon the Lessor's delivery of the Equipment to a common carrier for transporting to Lessee (the "Equipment Acceptance Date"). Lessee shall, at its sole expense, obtain and maintain throughout the Term general commercial liability insurance against claims for bodily injury, death and property damage with limits of not less than One Million Dollars ($1,000,000.00) per occurrence and Three Million Dollars ($3,000,000.00) general aggregate, or as agreed to by the parties, to cover such liability caused by, or arising out of activities of the Lessee and/or Lessee's employees with respect to the Equipment. Further, Lessee shall provide any reasonable and standard insurance protection requested by Lessor for operations of the equipment in Canada.

EXHIBIT 1

All such certificates evidencing such insurance shall name ZANWAT EQUIPMENT, LLC, as an additional insured. Lessee represents that it has workers' compensation insurance to the extent required by law and all other required insurance to operate the business of Lessee. Lessee agrees to furnish proof of all such insurance to the Lessor upon request.

13.    **Damage.** Lessee shall be responsible for any loss of or damage to the Equipment from any cause at all, whether or not insured, from the Equipment Acceptance Date. If the Equipment is lost, stolen or damaged, Lessee will promptly notify the Lessor of such event. In no event shall such loss or damage relieve Lessee of its obligations under this Agreement. In the event of such loss or damage, Lessee, at its option, shall: (i) promptly repair the Equipment to return it to good working order; or (ii) replace the Equipment with like Equipment of the same or later model (upon the Lessor's written approval), in good condition and working order, free and clear of all liens and encumbrances and grant the Lessor the right to perfect its security interest in the replacement Equipment and such replacement shall be substituted in this Agreement by appropriate amendment.

14.    **Indemnification.** Lessee shall indemnify, defend and hold the Lessor and its employees, agents and contractors harmless from all losses, liabilities, actions, suits, judgments, obligations, fines, penalties, claims, costs and expenses (including reasonable attorneys' fees and investigative fees) arising out of the rental of the Equipment and all acts and omissions related thereto.

15.    **Security Interests in the Equipment.** In no event shall Lessee assert any ownership interest in or to the Equipment. Lessee shall not grant or permit any person or business entity to assert a security or other interest in the Equipment. At all times during the Term, Lessee shall ensure that the Equipment is identified as being owned by the Lessor.

16.    **Limitations of Damages and Remedies.** Even if advised of the possibility of such damages, in no event shall the Lessor be liable for (i) personal injury or property damages, or (ii) lost profits, work stoppage, lost data, or any other special, indirect or consequential damages of any kind. In the event of the Lessor's breach or failure to perform any obligation under this Agreement, the Lessor's entire liability and the Lessee's exclusive remedy shall be, at the Lessor's option, either (i) return of the monetary consideration paid to the Lessor under this Agreement, or (ii) the Lessor's performance of any obligation that failed to satisfy the terms of this Agreement, including the repair of any damaged or defective Equipment.

17.    **Disclaimer of Warranties.** The Lessor disclaims and excludes all warranties, express and implied, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose, concerning the Equipment leased under this Agreement. The Parties acknowledge and agree the Equipment shall be leased and accepted "AS IS" with all defects.

**EXHIBIT 1**

18.    <u>Personal Property</u>. The Equipment is and shall at all times be and remain personal property, notwithstanding that the Equipment, or any part thereof, may now be or hereafter become in any manner affixed or attached to or embedded in or permanently rested upon real property or any building thereon or attached in any manner to what is permanent by any means of cement, plaster, nails, bolts, screws or otherwise.

19.    <u>Confidential Information and Non-Disclosure</u>. The Equipment is in a configuration developed by Tim Watterberg, one of the members of Lessor, for the production of Lick Tubs. The Equipment configuration contains confidential know-how, trade secrets and manufacturing plant designs, herein "Confidential Information". The Confidential Information is owned by Lessor. Lessee will not reveal or use the Confidential Information except as allowed in this Lease Agreement. Lessee will execute the Non-Disclosure Agreement in the form attached hereto as Exhibit "C" ("NDA"). Lessee will cause all employees, owners, members, contractors and agents that are allowed access to the Equipment to sign the NDA in a form substantially similar to the attached Exhibit "C", approved by Lessor. The required non-disclosure agreements shall be executed prior to Lessee providing any individual or entity access to the Equipment. Lessee will not infringe upon (and will defend and indemnify the other party against any infringement of) any copyright, patent, trade secret or other property right of Lessor in the performance of this Agreement. Lessor shall retain its Confidential Information that it owns prior to entry into this Agreement. Lessee shall not use the Confidential Information at any location other than the premises described in paragraph 1, without the express written consent of Lessor. Lessee will not manufacturer Lick Tubs at any other location, without the express written consent of Lessor. Any Lick Tubs produced by Lessee at any location shall require the Lease Payment as provided in the attached Exhibit "B".

20.    <u>General Provisions</u>.

    20.1    <u>Entire Agreement; Amendment</u>. This Agreement (including all attached or referenced exhibits, addenda and schedules) is intended by the Parties as the final and binding expression of their agreement and as the complete and exclusive statement of its terms. This Agreement cancels, supersedes and revokes all prior negotiations, representations and agreements between the Parties, whether written or oral, relating to the subject matter of this Agreement. The terms and conditions of any purchase order or similar document submitted by Lessee in connection with this Agreement shall not be binding upon the Lessor. This Agreement may be amended only in writing duly executed by all Parties.

    20.2    <u>Assignment</u>. This Agreement may not be assigned by a Party without the prior written consent of the other Party. Any assignment attempted to be

**EXHIBIT 1**

made in violation of this Agreement shall be void. In the event of any assignment, Lessee shall remain responsible for its performance and liable for assignee's performance.

20.3 Force Majeure. No Party to this Agreement shall be responsible for any delays or failure to perform any obligation under this Agreement due to acts of God, strikes or other disturbances, including, without limitation, war, insurrection, embargoes, governmental restrictions, acts of governments or governmental authorities, and any other cause beyond the control of such party. During an event of force majeure, the Parties' duty to perform obligations shall be suspended.

20.4 Governing Law; Consent to Jurisdiction. The internal laws of the state of South Dakota shall govern the validity, construction and enforceability of this Agreement, without giving effect to its conflict of laws principles. All suits, actions, claims and causes of action relating to the construction, validity, performance and enforcement of this Agreement shall be in the courts of Brookings County, South Dakota.

20.5 Independent Contractor. In the performance of their obligations under this Agreement, the Parties shall be independent contractors, and shall have no other legal relationship, including, without limitation, joint ventures, or employees. Neither Party shall have the right or power to bind the other Party and any attempt to enter into an agreement in violation of this section shall be void.

20.6 Notices. All notices, requests and other communication that a Party is required or elects to deliver shall be in writing and shall be delivered personally, or by facsimile (provided such delivery is confirmed), or by a recognized overnight courier service, to the other Party at its address set forth below or to such other address as such Party may designate by notice given pursuant to this section.

If to the Lessor:    ZANWAT EQUIPMENT, LLC
                     PO Box 336
                     Aurora, SD 57002


If to Lessee:        BOSS FEEDS, LTD
                     PO Box 107

**EXHIBIT 1**

Cardston Alberta Canada TOK OKO

20.7    <u>Severability</u>. If one or more provisions of this Agreement, or the application of any provision to any Party or circumstance, is held invalid, unenforceable, or illegal in any respect, the remainder of this Agreement and the application of the provision to other Parties or circumstances shall remain valid and in full force and effect.

20.8    <u>Non-Waiver of Defaults</u>. Any failure of the Lessor at any time, or from time to time, to enforce or require the strict keeping and performance of any of the terms and conditions of this Agreement, or to exercise a right hereunder, shall not constitute a waiver of such terms, conditions or rights, and shall not affect or impair the same, or the right of the Lessor to avail itself same.

20.9    <u>Section Headings</u>. All section headings are for convenience of reference only and are not intended to define or limit the scope of any provision of this Agreement.

20.10    <u>Execution</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all together shall constitute but one and the same Agreement.

IN WITNESS WHEREOF, the Parties have entered into this Agreement, effective as of the Effective Date set forth above.

ZANWAT EQUIPMENT, LLC

By: _____

Name: _____

Title: _____

BOSS FEEDS, LTD

By: _____     _____

Name: Burka Nish     Brett Stewart

Title: Director     Director

**EXHIBIT 1**

Cardston Alberta Canada TOK OKO

20.7 Severability. If one or more provisions of this Agreement, or the application of any provision to any Party or circumstance, is held invalid, unenforceable, or illegal in any respect, the remainder of this Agreement and the application of the provision to other Parties or circumstances shall remain valid and in full force and effect.

20.8 Non-Waiver of Defaults. Any failure of the Lessor at any time, or from time to time, to enforce or require the strict keeping and performance of any of the terms and conditions of this Agreement, or to exercise a right hereunder, shall not constitute a waiver of such terms, conditions or rights, and shall not affect or impair the same, or the right of the Lessor to avail itself same.

20.9 Section Headings. All section headings are for convenience of reference only and are not intended to define or limit the scope of any provision of this Agreement.

20.10 Execution. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all together shall constitute but one and the same Agreement.

IN WITNESS WHEREOF, the Parties have entered into this Agreement, effective as of the Effective Date set forth above.


ZANWAT EQUIPMENT, LLC

By: _____

Name: _MATT ZANCANELL_

Title: _Manager_

BOSS FEEDS, LTD


By: _____

Name: _____

Title: _____

**EXHIBIT 1**

# EXHIBIT A

## EQUIPMENT

Eight (8) Tube and Shell Cookers

All Steam Piping to Cookers

Premix Hopper

Auger Mixer

Electric Motors attached to Hopper and Mixer

Starter Controls for Electric Motors

Digital Scale

**EXHIBIT 1**

## EXHIBIT B

## PAYMENT SCHEDULE

**Agreed Definition.** For the purposes of calculating the sums to be paid to Lessor as rent, the following terms have the following definitions:

    1.1.  "Gross Revenue from Operations" shall be all gross revenues collected by Lessee from the sale of any Lick Tubs produced using the Equipment or any other operation located.

    1.2.  "Net Cash from Operations" shall be all Gross Revenue from Operations collected, less Direct Expenses incurred by Lessee.

    1.3.  "Direct Expenses" shall mean:

        1.3.1.  Costs of materials used to make the Lick Tubs products

        1.3.2.  Direct Labor for production of the Lick Tubs or similar product.   Payment of any kind to an Owner, Shareholder, Member, Manager, of Officer of Lessee, including but not limited to Brett Stewart and Burk Nish, shall not be included in Direct Labor.

        1.3.3.  Real Property Taxes

        1.3.4.  Cost of repairs, maintenance, and replacement of the leased Equipment.

        1.3.5.  Utilities at the production facility.

        1.3.6.  The material, parts, and labor costs of installing and initiating operation of the Equipment.

**Lease Payment.** Lessee shall pay to Lessor all lease payment quarterly, within 30 days of the end of each business quarter.   The lease payment shall be one-half of the Net Cash From Operations of the operations of the business by the Lessee.  The term 'Net Cash From Operations' means, the gross sales of the Lessee less 'Agreed costs'.

**Protection of Rights.** Lessee will take all actions required to maintain the value of the Lease Payments and Lessor's rights to the same hereunder.  Lessee will refrain from taking any actions which could adversely affect the value of the Lease Payments or any of Lessor's rights or remedies under this Agreement.

**Lease Payment Reporting.** Lessee will provide electronically to Lessor, within thirty days following the end of each calendar quarter during the term of this Agreement and within thirty days following the termination of this Agreement, a complete and accurate Lease Payment report (in a mutually acceptable form, which may be updated from time to time by agreement of the parties hereto) calculating 'Net Cash From Operations' during the most recently ended calendar quarter (or partial calendar quarter with respect to the first and last calendar quarters for which such report is delivered in accordance herewith).

**Payment Provisions.** Without limiting (and notwithstanding) Lessor's other rights and remedies, any amounts that are not paid when due hereunder will bear interest at a rate of ten percent.  All payments will be made by wire transfer of United States dollars, or as agreed to by the parties.

**EXHIBIT 1**

The Lessor will bear all taxes imposed on it with respect to any payments received by it hereunder.

Any payment once made by Lessee to Lessor will not be refunded or refundable to Lessee. Notwithstanding the foregoing, in the case of any clerical error with respect to a payment made by Lessee, the parties will remedy such clerical error through timely proper payment adjustments.

**Lease Payment Financial Audit.**

Lessee will: (i) create and maintain complete and accurate books and records that are sufficient to determine the amounts payable to Lessor under this Agreement and are in a form complying with GAAP ("Books and Records") and IFRS Standards as generally accepted accounting standards in Canada; and ensure that sufficient electronic or other appropriate backup systems are in place to prevent destruction or loss of any Books and Records.

Upon no less than thirty days' prior written notice, Lessor has the right to examine and audit, through a recognized registered public accounting firm designated by Lessor (the "Auditor"), all Books and Records of Lessee. The Auditor will be bound by confidentially requirements under the rules of professional conduct applicable to such firm.

Lessee will make all Books and Records available to the Auditor to examine at the normal location where Lessor maintains the Books and Records, provide copies thereof to be retained by the Auditor in its records and provide the Books and Records in electronic native format to be retained by the Auditor in its records. Lessor will obtain and maintain accounting, information, communication and operating systems and capabilities that will allow the Books and Records to be exported in their native form, Excel or other reasonably requested format to assist the Auditor, and will export such Books and Records. The Auditor will be given access to office locations and knowledgeable personnel of Lessee for interviews. Lessee will completely and accurately prepare all workpapers reasonably requested by the Auditor, including support for the calculation of amounts payable under this Agreement. If any Books and Records are not provided by Lessee as required hereunder, the Auditor will have the right to make an estimate of the amounts payable hereunder and such estimates will be final and binding on the parties. Audits will not be performed more frequently than once per calendar year, but if any audit hereunder reveals an underpayment, the next audit may be conducted within the same calendar year. Lessee will take reasonable actions to enable the audit to be commenced and completed swiftly and efficiently.

After an audit is complete, the Auditor will provide to Lessor and Lessee an audit report, including schedules summarizing the Auditor's findings. The parties and the Auditor will hold a joint meeting at Lessee's headquarters, or electronically, in which the Auditor explains the findings and data sources utilized to create such schedules that support the audit findings. Subject to the results of the audit report and schedules of findings will be final, and Lessee will pay Lessor within fifteen days after receipt of the audit report any amounts that the Auditor determined to be owed and unpaid by Lessee, together with interest thereon at the rate set forth herein.

**EXHIBIT 1**

If Lessee reasonably believes that such audit report or any such schedule of findings was materially flawed, Lessee will within ten days after receipt of the audit report provide written notice to Lessor and the Auditor of such belief. If Lessor does not receive such notice within such ten-day period, the results of the audit report and schedules of findings will be final and binding on the parties hereto, and Lessee will pay Lessor any amounts that the Auditor determines are due and owing by Lessee to Lessor in accordance with this agreement. Upon receipt of such notice by Lessor, Lessee will have twenty days to provide the Auditor and Lessor with a detailed explanation of why it reasonably believes the audit report and/or schedules of findings were materially flawed and supporting documentation and information that it relies upon to support that conclusion. If the Auditor and Lessor do not receive such detailed explanation within such twenty-day period, the results of the audit report and schedules of findings will be final and binding on the parties hereto, and Lessee will pay Lessor any amounts that the Auditor determined to be due and owing by Lessee to Lessor, together with interest thereon at the rate set forth in this agreement no later than two Business Days following the expiry of such twenty day period.

The Auditor will take Lessee's detailed explanation and any such supporting documentation and information into account, as well as any objection by Lessor to such explanation or information or documentation, in determining whether to revise its findings; provided that any determination by the Auditor to revise its findings will be made in the Auditor's sole discretion. After the Auditor's review is complete, the Auditor will provide to the Lessor and Lessee its determination regarding whether to revise its findings, together with a revised audit report, if applicable. The determination by the Auditor regarding its findings, and the adjustment thereto by the Auditor, if any, will be final and binding on the parties hereto, and (i) within fifteen days after receipt of such determination and any accompanying audit report, Lessee will pay Lessor any amounts that the Auditor determines to be due and owing by Lessee to Lessor hereunder together with interest thereon at the rate set forth herein, or alternatively, Lessee will be given a credit for any amounts of Lease Payments that the Auditor determines to have been overpaid by Lessee hereunder, in which case such credit will be applied against subsequent payments of Lessee until it is fully used and, if a credit balance remains after any and all payments of Lessee have been made, Lessor will promptly refund the amount of any such unapplied credit amount to Lessee.

The costs and expenses of the Auditor will be borne by Lessor; provided, however, that if the final and binding determination of the Auditor determines that, as a result of the audit, there are amounts due and owing by Lessee to Lessor hereunder for any reporting period, such costs and expenses will be borne equally by Lessor and lessee; provided, further, that if the Auditor determines that either (i) the unpaid amounts for any reporting period exceed five percent of the Lease Payments due and payable by Lessee to Lessor hereunder for such reporting period or (ii) Lessee fails to comply in any material respects with this agreement, then Lessee will pay all of the costs and expenses of such audit. Lessee will pay, within fifteen days after the audit report becomes final, (A) audit costs to the extent it is obligated to pay under the preceding sentence and (B) interest at the rate described herein on the amount determined by the Auditor to have been underpaid.

**EXHIBIT 1**

## EXHIBIT C

### NON-DISCLOSURE AGREEMENT

Dated: _____, _____.

Zanwat Equipment, LLC (hereinafter "Inventor"), a South Dakota, USA limited liability company, is the Owner of certain Confidential Information owned by Inventor and identified as confidential, proprietary, or equivalent (hereinafter "Confidential Information"). The Confidential Information has been made available to Boss Feed, Ltd. The Confidential Information will be disclosed to:

_____, (hereinafter, "Recipient")

_____
_____
(Recipient's address)

as part of Recipient's employment at, or contracting with Boss Feeds, Ltd.

The Confidential Information disclosed by Inventor is Plant and Manufacturing Equipment configurations, know-how, trade secrets and plant manufacturing plant designs used by Boss Feeds, Ltd. in the production of Lick Tubs, all of which has been provided by Inventor to Boss Feeds, Ltd.

Recipient (on behalf of him/herself, and on behalf of her/his company, officers, directors, agents, employees, and/or affiliates) acknowledges that such Confidential Information is a special, valuable and unique asset of the Inventor. In consideration of receiving such Confidential Information Recipient agrees, by its signature below, to use such Confidential Information while employed by or in contract with Boss Feeds, Ltd. only, unless otherwise hereafter agreed to in writing by Inventor, and to use best efforts to maintain the confidentiality of the Confidential Information, which includes limiting access to the Confidential Information to those officers, directors, agents, and employees, among others, within Recipient's organization and/or control who reasonably require access in order to accomplish the purpose outlined in this Agreement, and who are under an enforceable obligation to keep said Confidential Information confidential. Recipient shall be responsible for maintaining the confidentiality of the Confidential Information disclosed to all others by Recipient; and will be liable for any unauthorized disclosure arising out of Inventor's or Boss Feeds, Ltd.'s disclosure to Recipient.

Recipient agrees not to reverse engineer nor attempt to obtain additional knowledge beyond the scope of this Nondisclosure Agreement to any feature or characteristic of the Confidential Information. Recipient agrees not to independently develop concepts, ideas, or designs related to any features or characteristic of the Confidential Information.

This commitment shall impose NO obligation upon Recipient with respect to any portion of the Information which is clear and convincingly evidenced by written records which:

1. is now, or which hereafter, through no act or failure to act on Recipient's part, becomes generally known or available to the public or is independently developed by a third party;

2. is known to Recipient at the time said Information is received from Inventor;

3. is hereafter furnished to Recipient by a third party as a matter of right and without

**EXHIBIT 1**

restriction on disclosure; or

    4. is independently developed by Recipient provided that the person or persons developing same have not had any access to any part of the Information as furnished by Inventor nor received any guidance, whether direct or indirect, from individual recipients of the Information.

    Recipient agrees to promptly return all, regardless of form of media, originals and copies of the Confidential Information upon request by Inventor. No Intellectual Property or other license or right of use of the Confidential Information is granted either directly or indirectly by this Agreement, nor are any rights of ownership in the Confidential Information granted by this Agreement.

    Inventor makes no warranty either as to the accuracy of the Confidential Information or that any new products will be produced based on the Confidential Information.

    This Agreement, and the rights and obligations thereunder, may not be transferred or assigned by Recipient without the prior written consent of the Inventor.

    Recipient and Inventor (the parties) agree that this Agreement and any disputes arising thereunder will be governed by the laws and courts of the state of South Dakota, USA, and since the breach of the Agreement will cause irreparable harm to Inventor, it is agreed that in such event, Inventor will be entitled to equitable relief in addition to other remedies, in order to restrain such breach.

    Nothing in this Agreement shall be construed as an obligation by either party to enter into a contract, subcontract, or other business or employment relationship with the other party.

    This is the entire Agreement between the parties concerning the disclosure and use of the Confidential Information, superseding any prior or contemporaneous written or oral agreements as to the disclosure and protection of the Invention with the aforesaid purposes and may not be amended or modified except by subsequent agreement in writing by duly authorized representatives of the parties.

    In the event that any one or more provisions contained herein should, for any reason, be held to be unenforceable in any respect under the laws of any State or of the United States of America, unenforceability shall not affect any other provisions herein contained. Instead, this Agreement shall be construed as if such unenforceable provision had not been contained herein.

<u>**READ, UNDERSTOOD AND AGREED:**</u>

INVENTOR:

Zanwat Equipment, LLC

By: _____

      Tim Watterberg, Member         Dated: _____

RECIPIENT:

_____      Dated: _____

_____(Print Name)

Recipient Title (if applicable):_____

**EXHIBIT 1**

**EXHIBIT**

**2A**

tobbles

**EXHIBIT C**

**NON-DISCLOSURE AGREEMENT**

Dated: _May 31_ , _2020_ .

Zanwat Equipment, LLC (hereinafter "Inventor"), a South Dakota, USA limited liability company, is the Owner of certain Confidential Information owned by Inventor and identified as confidential, proprietary, or equivalent (hereinafter "Confidential Information"). The Confidential Information has been made available to Boss Feed, Ltd. The Confidential Information will be disclosed to:

_Reent Nish / Burke Nish_ , (hereinafter, "Recipient")
_Box 109 Cardston Alberta T0K 0K0_

(Recipient's address)

as part of Recipient's employment at, or contracting with Boss Feeds, Ltd.

The Confidential Information disclosed by Inventor is Plant and Manufacturing Equipment configurations, know-how, trade secrets and plant manufacturing plant designs used by Boss Feeds, Ltd. in the production of Lick Tubs, all of which has been provided by Inventor to Boss Feeds, Ltd.

Recipient (on behalf of him/herself, and on behalf of her/his company, officers, directors, agents, employees, and/or affiliates) acknowledges that such Confidential Information is a special, valuable and unique asset of the Inventor. In consideration of receiving such Confidential Information Recipient agrees, by its signature below, to use such Confidential Information while employed by or in contract with Boss Feeds, Ltd. only, unless otherwise hereafter agreed to in writing by Inventor, and to use best efforts to maintain the confidentiality of the Confidential Information, which includes limiting access to the Confidential Information to those officers, directors, agents, and employees, among others, within Recipient's organization and/or control who reasonably require access in order to accomplish the purpose outlined in this Agreement, and who are under an enforceable obligation to keep said Confidential Information confidential. Recipient shall be responsible for maintaining the confidentiality of the Confidential Information disclosed to all others by Recipient; and will be liable for any unauthorized disclosure arising out of Inventor's or Boss Feeds, Ltd.'s disclosure to Recipient.

Recipient agrees not to reverse engineer nor attempt to obtain additional knowledge beyond the scope of this Nondisclosure Agreement to any feature or characteristic of the Confidential Information. Recipient agrees not to independently develop concepts, ideas, or designs related to any features or characteristic of the Confidential Information.

This commitment shall impose NO obligation upon Recipient with respect to any portion of the Information which is clear and convincingly evidenced by written records which:

1. is now, or which hereafter, through no act or failure to act on Recipient's part, becomes generally known or available to the public or is independently developed by a third party;

2. is known to Recipient at the time said Information is received from Inventor;

3. is hereafter furnished to Recipient by a third party as a matter of right and without

restriction on disclosure; or

    4. is independently developed by Recipient provided that the person or persons developing same have not had any access to any part of the Information as furnished by Inventor nor received any guidance, whether direct or indirect, from individual recipients of the Information.

    Recipient agrees to promptly return all, regardless of form of media, originals and copies of the Confidential Information upon request by Inventor. No Intellectual Property or other license or right of use of the Confidential Information is granted either directly or indirectly by this Agreement, nor are any rights of ownership in the Confidential Information granted by this Agreement.

    Inventor makes no warranty either as to the accuracy of the Confidential Information or that any new products will be produced based on the Confidential Information.

    This Agreement, and the rights and obligations thereunder, may not be transferred or assigned by Recipient without the prior written consent of the Inventor.

    Recipient and Inventor (the parties) agree that this Agreement and any disputes arising thereunder will be governed by the laws and courts of the state of South Dakota, USA, and since the breach of the Agreement will cause irreparable harm to Inventor, it is agreed that in such event, Inventor will be entitled to equitable relief in addition to other remedies, in order to restrain such breach.

    Nothing in this Agreement shall be construed as an obligation by either party to enter into a contract, subcontract, or other business or employment relationship with the other party.

    This is the entire Agreement between the parties concerning the disclosure and use of the Confidential Information, superseding any prior or contemporaneous written or oral agreements as to the disclosure and protection of the Invention with the aforesaid purposes and may not be amended or modified except by subsequent agreement in writing by duly authorized representatives of the parties.

    In the event that any one or more provisions contained herein should, for any reason, be held to be unenforceable in any respect under the laws of any State or of the United States of America, unenforceability shall not affect any other provisions herein contained. Instead, this Agreement shall be construed as if such unenforceable provision had not been contained herein.

**READ, UNDERSTOOD AND AGREED:**

INVENTOR:

Zanwat Equipment, LLC

By: _____

    Tim Watterberg, Member        Dated: _____

RECIPIENT:

*Burke Nish*

*Burke Nish* _____ (Print Name)    Dated: *May 31 2020*

Recipient Title (if applicable): *Director* _____

**EXHIBIT 2A**

EXHIBIT
2B

## EXHIBIT C

## NON-DISCLOSURE AGREEMENT

Dated: May 31 , 2020 .

Zanwat Equipment, LLC (hereinafter "Inventor"), a South Dakota, USA limited liability company, is the Owner of certain Confidential Information owned by Inventor and identified as confidential, proprietary, or equivalent (hereinafter "Confidential Information"). The Confidential Information has been made available to Boss Feed, Ltd. The Confidential Information will be disclosed to:

_Tyler Smith / Brett Stewart_, (hereinafter, "Recipient")
Box 607 Cardston  TOK OKO
Cardston  AB.
(Recipient's address)

as part of Recipient's employment at, or contracting with Boss Feeds, Ltd.

The Confidential Information disclosed by Inventor is Plant and Manufacturing Equipment configurations, know-how, trade secrets and plant manufacturing plant designs used by Boss Feeds, Ltd. in the production of Lick Tubs, all of which has been provided by Inventor to Boss Feeds, Ltd.

Recipient (on behalf of him/herself, and on behalf of her/his company, officers, directors, agents, employees, and/or affiliates) acknowledges that such Confidential Information is a special, valuable and unique asset of the Inventor. In consideration of receiving such Confidential Information Recipient agrees, by its signature below, to use such Confidential Information while employed by or in contract with Boss Feeds, Ltd. only, unless otherwise hereafter agreed to in writing by Inventor, and to use best efforts to maintain the confidentiality of the Confidential Information, which includes limiting access to the Confidential Information to those officers, directors, agents, and employees, among others, within Recipient's organization and/or control who reasonably require access in order to accomplish the purpose outlined in this Agreement, and who are under an enforceable obligation to keep said Confidential Information confidential. Recipient shall be responsible for maintaining the confidentiality of the Confidential Information disclosed to all others by Recipient; and will be liable for any unauthorized disclosure arising out of Inventor's or Boss Feeds, Ltd.'s disclosure to Recipient.

Recipient agrees not to reverse engineer nor attempt to obtain additional knowledge beyond the scope of this Nondisclosure Agreement to any feature or characteristic of the Confidential Information. Recipient agrees not to independently develop concepts, ideas, or designs related to any features or characteristic of the Confidential Information.

This commitment shall impose NO obligation upon Recipient with respect to any portion of the Information which is clear and convincingly evidenced by written records which:

1. is now, or which hereafter, through no act or failure to act on Recipient's part, becomes generally known or available to the public or is independently developed by a third party;

2. is known to Recipient at the time said Information is received from Inventor;

3. is hereafter furnished to Recipient by a third party as a matter of right and without

restriction on disclosure; or

    4. is independently developed by Recipient provided that the person or persons developing same have not had any access to any part of the Information as furnished by Inventor nor received any guidance, whether direct or indirect, from individual recipients of the Information.

    Recipient agrees to promptly return all, regardless of form of media, originals and copies of the Confidential Information upon request by Inventor. No Intellectual Property or other license or right of use of the Confidential Information is granted either directly or indirectly by this Agreement, nor are any rights of ownership in the Confidential Information granted by this Agreement.

    Inventor makes no warranty either as to the accuracy of the Confidential Information or that any new products will be produced based on the Confidential Information.

    This Agreement, and the rights and obligations thereunder, may not be transferred or assigned by Recipient without the prior written consent of the Inventor.

    Recipient and Inventor (the parties) agree that this Agreement and any disputes arising thereunder will be governed by the laws and courts of the state of South Dakota, USA, and since the breach of the Agreement will cause irreparable harm to Inventor, it is agreed that in such event, Inventor will be entitled to equitable relief in addition to other remedies, in order to restrain such breach.

    Nothing in this Agreement shall be construed as an obligation by either party to enter into a contract, subcontract, or other business or employment relationship with the other party.

    This is the entire Agreement between the parties concerning the disclosure and use of the Confidential Information, superseding any prior or contemporaneous written or oral agreements as to the disclosure and protection of the Invention with the aforesaid purposes and may not be amended or modified except by subsequent agreement in writing by duly authorized representatives of the parties.

    In the event that any one or more provisions contained herein should, for any reason, be held to be unenforceable in any respect under the laws of any State or of the United States of America, unenforceability shall not affect any other provisions herein contained. Instead, this Agreement shall be construed as if such unenforceable provision had not been contained herein.

**READ, UNDERSTOOD AND AGREED:**

INVENTOR:

Zanwat Equipment, LLC

By: _____

    Tim Watterberg, Member        Dated: _____

RECIPIENT:

_____

Brett Stuart        (Print Name)    Dated: May 31

Recipient Title (if applicable): Director _____

**EXHIBIT 2B**



EXHIBIT

**3**

**RIBSTEIN & HOGAN**
**LAW FIRM**

RICK A. RIBSTEIN
TIM HOGAN
ANTHONY J. TEESDALE
JORDYN BANGASSER
BRIAN A. ZIELINSKI*

621 SIXTH STREET, BROOKINGS, SD 57006
PHONE: 605-692-1818 | FAX: 605-692-7922
WWW.SDAKOTALAW.COM

*ALSO LICENSED IN MINNESOTA & MICHIGAN

Sender's email:
timhogan@sdakotalaw.com

April 22, 2022
Via Email/Mail

**NOTICE OF DEFAULT AND DEMAND**

Frank A. de Walle
de Walle & Quan Law Office
323 7th Street South
Lethbridge, Alberta T1J 2G4
Email: dewalle@telusplanet.net

Re: Zanwat Equipment, LLC / Boss Feeds, LLC

Dear Mr. de Walle:

I represent Matt Zancanella, the manager of TWT Equipment, LLC ("TWT"). TWT is the owner of a 50% membership interest in Zanwat Equipment, LLC ("Zanwat" or "Lessor"). I have been in contact with Bruce C. Moore, attorney for Tim Watterberg ("Watterberg"). Watterberg owns the remaining 50% member interest in Zanwat. This letter is sent with the authorization of both members of Zanwat.

Zanwat, a South Dakota limited liability company, entered into an Equipment Lease Agreement dated June 16, 2020 ("Agreement") with your client, Boss Feeds, LTD ("Boss Feeds"). Pursuant to the Agreement, Zanwat agreed to lease equipment to Boss Feeds for the production of lick tubs at Boss Feeds' facility in Canada. In exchange, Boss Feeds agreed to make payments to Zanwat consistent with Exhibit B to the Agreement. I have attached these documents for your reference.

The term of the Agreement remains through June 16, 2030.



## NOTICE OF DEFAULT

This letter constitutes notice of Boss Feeds' default under the Agreement, as follows: 1) Boss Feeds has failed to pay Zanwat the payments required by the Agreement; and 2) Boss Feeds has failed to keep and provide the financial disclosures and records required in the Agreement.

There are additional defaults which are not the subject of this letter, and Zanwat is not deemed to have waived any claims or rights related to additional obligations owed by Boss Feeds.

Turning to the defaults which are the subject of this Notice and Demand.

1. <u>Failure to Pay</u>.   Under the Agreement, Zanwat is entitled to one-half of the Net Cash from Operations of Boss Feeds' business operation. The Agreement specifies that Zanwat is entitled to payment within 30 days of the end of each business quarter. After having received and despite Boss Feeds' conducting business with equipment leased from Zanwat for several business quarters, Boss Feeds has failed to make payments under the Agreement. Furthermore, Boss Feeds owes 10% interest on late payments, and this continues to accrue, until paid.

2.   <u>Financial Disclosures/Books and Records.</u>   The Agreement clearly sets forth a procedure by which the quarterly payments are to be made to Zanwat. When Boss Feeds entered into the Agreement, it agreed to create and maintain complete and accurate books and records that are sufficient to determine the amounts payable to Zanwat, in a form complying with GAAP and IFRS standards as generally accepted accounting standards in Canada. Zanwat has not been provided with any records which indicate that it has kept books in accordance with generally accepted accounting practices.

Boss Feeds has also not complied with the lease payment reporting provision in Exhibit B to the Agreement. Specifically, Boss Feeds has not provided a complete and accurate lease payment report calculating Net Cash Flow from Operations during each business quarter. Exhibit B makes clear that Zanwat is entitled to this information, which is essential to calculating the lease payments owed to Zanwat.

## DEMAND

By this letter, Zanwatt makes formal demand on Boss Feeds to cure the above defaults withing ten (10) days of the date of this letter. More specifically, demand is made upon Boss Feeds to:

1.   Pay all sums due and owing to Zanwat under the Agreement; and

**EXHIBIT 3**

2.   Provide the financial reporting and records required by the Agreement. These records may be provided electronically to my email address or sent by mail or courier service to my physical address. The financial records and reporting information is specifically detailed in the attached Agreement, Exhibit "B".

If Boss Feeds does not cure these defaults, the members have authorized the filing of litigation to enforce Zanwat's rights under the Agreement. In the event of litigation, Zanwat will seek attorney's fees, costs, and damages.

## NOTICE OF AUDIT

Pursuant to the terms of the Agreement, Zanwat provides Boss Feeds with thirty (30) days' written notice of Zanwat's intent to exercise its rights to examine and audit all Books and Records of Boss Feeds. Zanwat will designate the Auditor as provided in the Agreement. Boss Feeds is required to provide the Auditor with an opportunity to examine and obtain copies of the Books and Records in electronic native format. Zanwat expects Boss Feeds to fully comply with the audit requirements in the Agreement.

## CONFIRMATION OF SUFFICIENCY OF NOTICE

Please confirm in writing within three (3) business days hereof, that you and Boss accept this letter as satisfactory notice of our intention to send Auditors to Boss under Schedule "B" of the Agreement. If we do not have that confirmation from you by the time indicated, then in order to comply with the Agreement notice provisions, we will send a copy of this letter directly to Boss Feeds by facsimile and advise them it is a 30-day advance notice of Auditors being sent to their premises to examine all their books and records.

**EXHIBIT 3**

## CONCLUSION

I look forward to Boss Feeds' prompt and timely compliance with the demands herein.

Very truly yours,
RIBSTEIN & HOGAN LAW FIRM

Tim Hogan
Attorney for TWT

TH/can
Enclosure
pc:    Tim Watterberg
       watterberg10@gmail.com

       Matthew Zancanella
       mattz@proearthanimalhealth.com

       Teddy Nobles, Esq (Canada)
       TNobles@walshlaw.ca

       Bruce C. Moore (attorney for Tim Watterberg)
       bruce@mooreslaw.com

**EXHIBIT 3**